# EXHIBIT "A"

☒ IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.
☐ IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA.

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ FAMILY<br>☐ OTHER | **CIVIL COVER SHEET** | 12-15002 CA 06 |

| PLAINTIFF | VS. DEFENDANT | CLOCK IN |
|---|---|---|
| WELLS FARGO BANK, N.A. | WELLS FARGO BANK, N.A. | 1:57<br>MARIA GUEVARA |

The civil cover sheet and the information contained here does not replace the filing and service of pleadings or other papers as required by law. This form is required by the Clerk of Court for the purpose of reporting judicial workload data pursuant to Florida Statute 25.075. See instructions and definitions on reverse of this form.

**TYPE OF CASE** (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x in both the main category and subcategory boxes.

☐ 001 - Eminent Domain
☒ 003 - Contracts and Indebtedness
☐ 010 - Auto Negligence
☐ 022 - Products Liability
☐ 023 - Condominium
☐ **Negligence - Other**
  ☐ 097 - Business Governance
  ☐ 098 - Business Torts
  ☐ 099 - Environmental/Toxin Tort
  ☐ 100 - Third Party Indemnification
  ☐ 101 - Construction Defect
  ☐ 102 - Mass Tort
  ☐ 103 - Negligent Security
  ☐ 104 - Nursing Home Negligence
  ☐ 105 - Premises Liability - Commercial
  ☐ 106 - Premises Liability - Residential
  ☐ 107 - Negligence - Other
☐ **Real Property/Mortgage Foreclosure**
  ☐ 108 - Commercial Foreclosure $0 - $50,000
  ☐ 109 - Commercial Foreclosure $50,001 - $249,999
  ☐ 110 - Commercial Foreclosure $250,000 - or more
  ☐ 111 - Homestead Residential Foreclosure $0 - $50,000
  ☐ 112 - Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 113 - Homestead Residential Foreclosure $250,000 or more
  ☐ 114 - Non-Homestead Residential Foreclosure $0 - $50,000
  ☐ 115 - Non-Homestead Residential Foreclosure $50,001 - $249,999
  ☐ 116 - Non-Homestead Residential Foreclosure $250,000 or more
  ☐ 117 - Other Real Property Actions $0 - $50,000
  ☐ 118 - Other Real Property Actions $50,001 - $249,999

  ☐ 119 - Other Real Property Actions $250,000 or more
☐ **Professional Malpractice**
  ☐ 094 - Malpractice - Business
  ☐ 095 - Malpractice - Medical
  ☐ 096 - Malpractice - Other professional
☐ **Other**
  ☐ 120 - Antitrust/Trade Regulation
  ☐ 121 - Business Transactions
  ☐ 122 - Constitutional Challenge - Statute or Ordinance
  ☐ 123 - Constitutional Challenge - Proposed amendment
  ☐ 124 - Corporate Trust
  ☐ 125 - Discrimination - Employment or Other
  ☐ 126 - Insurance Claims
  ☐ 127 - Intellectual Property
  ☐ 128 - Libel/Slander
  ☐ 129 - Shareholder Derivative Action
  ☐ 130 - Securities Litigation
  ☐ 131 - Trade Secrets
  ☐ 132 - Trust Litigation
☐ 133 - **Other Civil Complaint**
  ☐ 009 - Bond Estreature
  ☐ 014 - Replevin
  ☐ 024 - Witness Protection
  ☐ 080 - Declaratory Judgment
  ☐ 081 - Injunctive Relief
  ☐ 082 - Equitable Relief
  ☐ 083 - Construction Lien
  ☐ 084 - Petition for Adversary Preliminary Hearing
  ☐ 085 - Civil Forfeiture
  ☐ 086 - Voluntary Binding Arbitration
  ☐ 087 - Personal Injury Protection (PIP)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐  No ☒

REMEDIES SOUGHT (check all that apply):

☒      monetary;

☒      non-monetary declaratory or injunctive relief;

☐      punitive

NUMBER OF CAUSES OF ACTION: [    ]

(specify) Breach of Contract (Count I); Preliminary and Permanent Injunction (Count II).

_____

IS THIS CASE A CLASS ACTION LAWSUIT?

☐  Yes

☒  No

HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?

☒  No

☐  Yes   If "Yes", list all related cases by name, case number, and court.

_____

_____

_____

IS JURY TRIAL DEMANDED IN COMPLAINT?

☐  Yes

☒  No

---

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief.

Signature _____   Florida Bar # 0 3 1 8 9 4 _____
                         (Attorney or party)                                                        (Bar # if attorney)

JOSHUA  SHORE                                                    4 | 16 | 12 _____
(type or print name)                                             Date

CLK/CT 96 Rev. 12/09                                      Clerk's web address: www.miami-dadeclerk.com

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

UNITED CREDIT RECOVERY, LLC,
d/b/a UNITED CREDIT RECOVERY OF
SANFORD FLORIDA

                    Plaintiff,

v.                                              CASE NO. 15002 CA 08

WELLS FARGO BANK, N.A.

                    Defendant.

_____

## COMPLAINT

Plaintiff United Credit Recovery, LLC files this complaint against Wells Fargo Bank, N.A., seeking preliminary and permanent injunctive relief, specific performance of contractual obligations existing between the parties, monetary damages and related relief.

## PARTIES, JURISDICTION & VENUE

1.      The Plaintiff is United Credit Recovery, LLC ("UCR"), a Delaware limited liability company with its principal place of business in Sanford, Florida.

2.      The Defendant is Wells Fargo Bank, N.A. ("Wells Fargo"), a nationally-chartered bank with its principal place of business in Beaverton, Oregon, and with multiple offices in Miami-Dade County, from which it conducts business.

3.      This Court has subject matter jurisdiction over the dispute, pursuant to Fla. Const., art. V, § 20(c)(3), Fla. Stat. §§ 26.012(2)(a), and 34.01(1)(c)(4), and otherwise, because the amount in controversy is in excess of fifteen thousand dollars ($15,000.00), exclusive of interest and costs.

4.     This Court has personal jurisdiction over Wells Fargo because it is authorized to transact business in the State of Florida, it in fact does transact substantial business in the State of Florida, the contracts at issue in this case were negotiated by UCR, in large part, from the State of Florida, and Wells Fargo's breach of contract is causing damage to UCR in the State of Florida.

5.     Venue is proper in this Court pursuant to Fla. Stat. § 47.051, and otherwise, because, on information and belief, Wells Fargo has multiple offices in Miami-Dade County from which it transacts its business.

6.     This Court is authorized to grant injunctive relief pursuant to Fla. Stat. § 26.012(3) and otherwise.

## FACTUAL ALLEGATIONS

7.     UCR is a financial institution engaged in, among other things, the business of purchasing demand deposit checking accounts with overdraft balances from other financial institutions, on which accounts it then attempts to collect.

8.     Wells Fargo is a national bank which originates such demand deposit accounts with overdraft balances.

9.     On January 6, 2010, UCR and Wells Fargo entered into a Purchase Agreement (the "Purchase Agreement") pursuant to which Wells Fargo agreed to sell its demand deposit checking accounts with overdraft balances (the "Receivables") to UCR.[1]

---

[1] Plaintiff has not attached a copy of the Purchase Agreement to this complaint because its plain terms are not in dispute and because its disclosure in the public record would divulge trade secrets in violation of an express confidentiality provision contained in the agreement. Upon request, Plaintiff will provide copies of the Purchase Agreement and the amendment thereto to the Court as required.

2

10.     Under the terms of the Purchase Agreement, Wells Fargo agreed to sell and assign to UCR on a monthly basis its eligible Receivables for a specified percentage of the aggregate outstanding balance of those Receivables on the applicable date of sale.

11.     The Purchase Agreement specified that the "Commitment Period," during which Wells Fargo was obligated to sell its Receivables to UCR at the stated price, was from February 1, 2010 through June 30, 2011.

12.     The Purchase Agreement also specified that, at the conclusion of the Commitment Period, UCR would have a "first right of refusal on additional offerings of the same product herein...." Wells Fargo, thus, agreed that if it decided to sell its Receivables after the Commitment Period expired, UCR had a contractual right to purchase the Receivables on the same terms offered by another *bona fide* purchaser. The parties intended for UCR's right of first refusal to extend a reasonable time beyond the Commitment Period.

13.     On August 23, 2010, prior to the expiration of the Commitment Period contained in the Purchase Agreement, Wells Fargo and UCR executed an Amendment to the Purchase Agreement (the "Amendment").[2] The parties had two express purposes in entering into the Amendment, which are stated in that document. The first purpose was to extend the Commitment Period (through January 31, 2012) and the second purpose was to modify the purchase price.

14.     The Amendment made no mention of, and did not alter or modify, UCR's right of first refusal following the expiration of the Commitment Period. The Amendment provided that "[t]he [Purchase] Agreement, and all its terms and conditions, is incorporated herein and made

---

[2] For the same reasons that UCR has not attached the Purchase Agreement to this complaint, it has not attached the Amendment.

3

part hereof as if fully set forth;" that "[u]nless otherwise expressly and specifically modified by the terms of [the Amendment], all terms, conditions, representations, warranties, duties, responsibilities, rights and privileges of the [Purchase] Agreement remain in full force and effect;" and that [t]he terms of this Amendment and of the [Purchase] Agreement shall, whenever possible, be read each consistent with the other...."

15.     UCR's right of first refusal following the expiration of the Commitment Period, as contained in the Purchase Agreement, was fully incorporated into and made part of the Amendment because the Amendment did not "expressly or specifically" modify that right. Instead, the Amendment simply extended the Commitment Period during which the Receivables would be sold by Wells Fargo to UCR for a set price.

16.     The parties both performed under the Purchase Agreement and Amendment through the extended Commitment Period of January 31, 2012.

17.     In or about March 2012, after the amended Commitment Period ended, Wells Fargo, in breach of UCR's contractual right of first refusal, offered its Receivables for sale without first contacting UCR.  After learning that Wells Fargo had offered its Receivables for sale, UCR contacted Wells Fargo, demanded that Wells Fargo sell the Receivables to UCR as required by the parties' agreements, and committed to purchase the Receivables at the same price as the highest bid received by Wells Fargo.  Wells Fargo refused, and, on information and belief, has continued to negotiate with another bidder for the purchase of the Receivables.

18.     Wells Fargo's only rationale for breaching UCR's contractual right of first refusal is the assertion that the Amendment somehow extinguished UCR's right of first refusal, even though the Amendment incorporates all of the Purchase Agreement's terms and conditions

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard • Suite 1300 • Miami, Florida 33131 • Phone: 305-371-6421 • Fax: 305-371-6322 • www.RoyBlack.com

unless "expressly and specifically" modified by the Amendment and there is no "express" or "specific" modification or elimination of UCR's right of first refusal in the Amendment.

19.   All conditions precedent to the maintenance of this action by UCR have occurred, have been satisfied or have been waived by Wells Fargo.

### Count 1: Breach of Contract

20.   UCR incorporates the foregoing paragraphs 1 through 19 by reference as if fully set forth herein.

21.   Wells Fargo and UCR entered into a Purchase Agreement pursuant to which the parties exchanged mutual promises regarding the sale of Wells Fargo's Receivables to UCR, which included a first right of refusal by UCR after the Commitment Period expired. The parties subsequently executed an Amendment which extended the Commitment Date and modified the purchase price but which otherwise incorporated all terms and conditions of the Purchase Agreement, including UCR's right of first refusal.  Both of these documents are valid and enforceable contracts.

22.   Wells Fargo has, without cause or justification, failed to perform certain of its obligations under the Purchase Agreement and Amendment by, among other things, (1) offering the Receivables to other prospective buyers, without first offering them to UCR; (2) refusing to agree to sell the Receivables to UCR at the price offered by the highest bidder; and (3) continuing to negotiate with prospective buyers after being notified by UCR that it was violating the terms of the parties' agreement.

23.   UCR seeks an order compelling Wells Fargo to perform its obligations under the Purchase Agreement and Amendment and honor UCR's right of first refusal, as it will be

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard • Suite 1300 • Miami, Florida 33131 • Phone: 305-371-6421 • Fax: 305-371-6322 • www.RoyBlack.com

extremely difficult to determine UCR's losses if Wells Fargo continues to breach those agreements.

24.     The Receivables are comprised of thousands of unique, individual accounts. The number of eligible accounts, the aggregate outstanding balance owed on the eligible receivables, and UCR's ability to collect differs from month to month. Even with respect to the known amount of Receivables presently up for sale, it would be very difficult if not impossible to determine what amounts UCR would be able to collect thereon, as its collection rate varies from month to month, depending on variables such as the unique circumstances of each account holder. Accordingly, an order of specific performance would most closely place the parties in the same position as they would have been had Wells Fargo not refused to acknowledge UCR's right of first refusal.

25.     UCR also seeks an award of damages for all losses caused by Wells Fargo's failure to honor UCR's contractual right to purchase the Receivables. The right of first refusal was a vital aspect of the Purchase Agreement and Amendment from UCR's perspective, and UCR would not have agreed to the existing terms of the Purchase Agreement and Amendment if not for the right of first refusal. As the result of Wells Fargo's attempt to change the terms of those agreements midstream, UCR has incurred losses. UCR purchased Wells Fargo's Receivables for nearly two years prior pursuant to the Purchase Agreement and Amendment, and the Receivables comprised a significant portion of UCR's business during that time. UCR anticipated that, with the right of first refusal, the Receivables would continue to comprise a large portion of its accounts and that it would have time to locate and prepare for other ventures in the event it decided not to exercise its contractual right. Wells Fargo's refusal to honor UCR's

6

right of first refusal has, thus, abruptly disrupted and altered UCR's business and is causing material damages to UCR.

26.     UCR seeks an order of this Court enforcing UCR's contractual right of first refusal pursuant to the Purchase Agreement and Amendment, a monetary judgment in the amount of damages sustained by UCR as determined at trial, and for all related relief.

### Count 2: Preliminary and Permanent Injunctive Relief

27.     UCR incorporates the foregoing paragraphs 1 through 26 by reference as if fully set forth herein.

28.     Upon information and belief, Wells Fargo is not only refusing to comply with its contractual obligation to sell its Receivables to UCR pursuant to UCR's right of first refusal, but is negotiating to sell the Receivables to another bidder.

29.     UCR seeks a preliminary and permanent injunctive order from the Court restraining Wells Fargo from selling the Receivables that are subject to UCR's right of first refusal to any other person or entity unless UCR declines to exercise its contractual right in any given month.

30.     UCR has a substantial likelihood of success on the merits.   The Purchase Agreement contained a right of first refusal that is unaffected by the Amendment.  However, upon information and belief, Wells Fargo has been negotiating with other entities and has indicated that it will not sell the Receivables to UCR even if UCR agrees to match the highest bid.

31.     The Receivables are comprised of thousands of unique, individual accounts to be bought and sold on an ongoing basis.  It will be extremely difficult, if not impossible, to calculate UCR's damages in the form of lost profits, as these profits are contingent upon the number of

7

eligible accounts Wells Fargo decides to sell in any given month, the aggregate balance of those accounts, and the percentage thereof on which UCR is able to collect.   Moreover, if the Receivables are sold to a third party, it will be nearly impossible to calculate the profits that UCR's unique skills and resources would have allowed it to earn had Wells Fargo honored its right of first refusal.   Without an injunction, UCR will suffer irreparable harm for which there is no adequate remedy at law because UCR's monetary damages, including any lost profits, would be nearly impossible to calculate, particularly with a continuing breach.

32.     The Receivables comprised a large portion of UCR's business.   UCR purchased Wells Fargo's Receivables for nearly two years prior to the expiration of the Commitment Period.   UCR anticipated that, with the right of first refusal, it would continue to purchase the Receivables until it could no longer afford to do so or until it had prepared for other ventures. Wells Fargo's refusal to honor UCR's right of first refusal has abruptly altered UCR's business. Thus, UCR has sustained irreparable injury for which it cannot adequately be compensated by monetary judgment.

33.     Although UCR now faces significant hardship and business losses as a result of Wells Fargo's breach, Wells Fargo will not be prejudiced if it is forced to honor UCR's right of first refusal.   UCR's right of first refusal simply provides it with the right to purchase the Receivables on the same terms as the highest bidder.   That is, Wells Fargo will receive the same purchase price regardless of whether it sells to UCR or a third-party.

34.     The public interest favors the entry of injunctive relief to protect the parties' contractual rights and expectations as reflected in the Purchase Agreement and Amendment.

8

## Prayer for Relief

WHEREFORE, Plaintiff UCR respectfully requests that judgment be entered in its favor:

1.     Issuing a preliminary and permanent injunction enjoining Defendant Wells Fargo from selling its Receivables to third parties without first offering the Receivables to UCR at the highest *bona fide* bid;

2.     Ordering specific performance by Wells Fargo of the terms of Purchase Agreement's right of first refusal;

3.     Awarding all damages to which UCR is entitled;

4.     Awarding reasonable attorney's fees as authorized by the Purchase Agreement, and otherwise;

5.     Granting all other such legal and equitable relief to UCR as the Court deems proper.

Dated: April 16, 2012

Respectfully Submitted,

By: _____

Larry A. Stumpf, Esq.
Florida Bar No. 280526
Joshua Shore, Esq.
Florida Bar No. 031894
Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Boulevard Suite 1300
Miami, Florida 33131
Tel: (305) 371-6421
Fax: (305) 371-6322

*Counsel for Plaintiff*

9

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

UNITED CREDIT RECOVERY, LLC,
d/b/a UNITED CREDIT RECOVERY OF
SANFORD FLORIDA

<div style="margin-left:3em">Plaintiff,</div>

v.

   WELLS FARGO BANK, N.A.,

<div style="margin-left:3em">Defendant.</div>
_____/

CASE NO. 12-15002 CA 08

## PLAINTIFF'S MOTION FOR TEMPORARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Plaintiff United Credit Recovery, LLC ("UCR"), pursuant to Florida Rule of Civil Procedure 1.610, moves for the issuance of a temporary injunction to preserve the status quo pending further order of this Court. In support of this motion, UCR states as follows.

### I.  BACKGROUND

This case arises because Wells Fargo has improperly prevented UCR from exercising its contractual right of first refusal to purchase certain receivables from Wells Fargo. Temporary injunctive relief is necessary to prevent the irreparable injury that will result if Wells Fargo sells the receivables at issue in this litigation to a third party before the Court has the opportunity to resolve UCR's claim for specific performance of its right of first refusal to purchase those very same receivables.

Wells Fargo is a national financial institution and, predictably, some of its accounts carry overdraft balances. UCR is a financial institution that, among other things, is engaged in the business of purchasing overdraft accounts from other financial institutions like Wells Fargo, and

attempts to earn a profit by collecting the amounts due from the account-holders.[1]  The overdraft

accounts sold by Wells Fargo and purchased by UCR are known as "receivables."

On January 6, 2010, UCR and Wells Fargo entered into a Purchase Agreement under

which Wells Fargo agreed to sell its deposit checking accounts with overdraft balances ("the

Receivables") to UCR.[2]  Under the terms of the Purchase Agreement, Wells Fargo agreed to sell

and assign to UCR on a monthly basis its eligible Receivables for a purchase price of a specified

percentage of the aggregate outstanding balance of those Receivables on the applicable date of

sale.[3]  The Purchase Agreement established the "Commitment Period," during which Wells

Fargo would sell its Receivables to UCR at the stated price, as running from February 1, 2010

until June 30, 2011.   The Purchase Agreement also stated that, *at the conclusion of the*

*Commitment Period*, UCR would have a "first right of refusal on additional offerings of the same

product. . . ."[4]   That is, Wells Fargo agreed that UCR had a contractual right to purchase the

Receivables on the same terms offered by another *bona fide* purchaser after the expiration of the

Commitment Period.[5]

On August 23, 2010, prior to the expiration of the Commitment Period, Wells Fargo and

UCR executed an Amendment to the Purchase Agreement, for two express purposes: to extend

---

[1] *See* Ex. A, Affidavit of Len Potillo ("Potillo Affidavit") at ¶ 2.
[2] *Id.* at ¶ 3.  Plaintiff has not attached a copy of the Purchase Agreement to its complaint because its plain terms are not in dispute and because its disclosure in the public record would divulge trade secrets in violation of an express confidentiality provision contained in the agreement. Upon request, Plaintiff will provide copies of the Purchase Agreement and the amendment thereto to the Court as required.  Because Wells Fargo presumably has a copy of the Purchase Agreement into which it entered, it is sufficiently aware of its contents and is not prejudiced thereby.
[3] *Id.*
[4] *Id.*
[5] *Id.*

2

the Commitment Period and to modify the purchase price.[6]   The Amendment extended the original Commitment Period to January 31, 2012.[7]

Significantly, the Amendment did not delete – or even mention – UCR's right of first refusal following the expiration of the Commitment Period; the Amendment merely changed the date on which the right of first refusal was triggered by changing the date that the Commitment Period expired.  In fact, the Amendment explicitly states that: the Purchase Agreement, "and all its terms and conditions, [are] incorporated herein and made part hereof as if fully set forth;" "[u]nless otherwise expressly and specifically modified by the terms of [the Amendment], all terms, conditions, representations, warranties, duties, responsibilities, rights and privileges of the [Purchase] Agreement remain in full force and effect;" and "[t]he terms of this Amendment and of the [Purchase] Agreement shall, whenever possible, be read each consistent with the other...."[8] Therefore, UCR's right of first refusal was "incorporated into and made part" of the Amendment and, because the Amendment does not "expressly or specifically" modify it, UCR's right of first refusal "remain[s] in full force and effect." Indeed, honoring UCR's right of first refusal is the *only* way for the Purchase Agreement and Amendment to "be read each consistent with the other," as those very documents require.

The parties fully performed under the Purchase Agreement and Amendment through the Commitment Period of January 31, 2012, during which time Wells Fargo neither expressly nor implicitly suggested that UCR's right of first refusal was ever in doubt.[9]  After the Commitment Period ended, Wells Fargo put its Receivables for the period of April (the "April Receivables")

---

[6] *Id.* at ¶ 5.  For the same reasons that UCR has not attached the Purchase Agreement to this complaint, it has not attached the Amendment.
[7] *Id.*
[8] *Id.*
[9] *Id.*

3

up for proposal, without first contacting UCR.[10]   After learning that Wells Fargo had put the April Receivables up for proposal, UCR contacted Wells Fargo, pursuant to its right of first refusal, and committed to purchase those Receivables at the same price as the highest bid received by Wells Fargo.[11]   To date, however, Wells Fargo has refused to honor UCR's contractual right to purchase the February Receivables and has, on information and belief, continued to negotiate with other bidders.[12]   Wells Fargo has asserted that the Amendment to the parties' Purchase Agreement somehow extinguished UCR's right of first refusal, even though the Amendment expressly incorporates the Purchase Agreement's terms and conditions, including UCR's right of first refusal.[13]   UCR was thus forced to file this suit against Wells Fargo seeking specific performance of the parties' agreement and to enjoin Wells Fargo from selling the April Receivables and future monthly Receivables in violation of that agreement.[14]

## II.   STANDARD OF REVIEW

A plaintiff seeking a temporary injunction is required to establish that (1) the plaintiff has a clear legal right which defendant has violated; (2) the plaintiff will suffer irreparable harm without the temporary injunction; (3) the plaintiff has an inadequate remedy at law; and (4) the public interest will be served by the issuance of the temporary injunction.   *See Keystone Creations, Inc. v. City of Delray Beach*, 890 So. 2d 1119, 1124 (Fla. 4th DCA 2004).

## III.   ARGUMENT

UCR meets the requirements for the issuance of a temporary injunction.   First, Wells Fargo has refused to honor UCR's contractual right of first refusal with regard to the April

---

[10] *Id.* at ¶ 6.
[11] *Id.* at ¶ 7.
[12] *Id.* at ¶ 9.
[13] *Id.* at ¶ 8.
[14] *Id.* at ¶ 9.

4

Receivables as contained in the Purchase Agreement and Amendment. As such, Wells Fargo has violated an unambiguous provision of the parties' contract. Second, UCR will suffer irreparable harm for which there is no adequate remedy at law if the Court does not issue a temporary injunction. The Receivables represent a significant portion of UCR's collection business, and UCR's business has been severely disrupted by Wells Fargo's refusal to honor UCR's right of first refusal.[15] In addition, the Receivables are high-risk investments, and the value of the Receivables to UCR is an unknown which is contingent on several factors that differ from month to month. Here, it is unknown what percentage of the aggregate balance of the April Receivables UCR can liquidate until such time as the accounts are sold to UCR and it begins the collection process.[16]

Attempting to calculate damages in the event that Wells Fargo continues to breach its agreement with UCR and sells the April Receivables to another party would, thus, be a difficult and imprecise exercise.[17] On the other hand, temporarily enjoining Wells Fargo from selling the April Receivables to another bidder will maintain the status quo and will not prejudice Wells Fargo, as it can either honor the parties' contract and sell the April Receivables to UCR at the highest bid price in the interim or sell the Receivables to another bidder at the same price if the Court determines, after an evidentiary hearing, that further injunctive relief is not proper.

**A.      UCR has a clear contractual right of first refusal.**

UCR meets the first element of a temporary injunction because it has a clear contractual right to the right of first refusal.

A valid contract, in which the parties have a meeting of the minds as to the essential

---

[15] Potillo Affidavit at ¶ 10.

[16] Id. at ¶ 11.

[17] Id.

5

terms of the agreement, creates legal rights which may be protected through the issuance of a temporary injunction. *See Zur v. Degani*, 629 So. 2d 244, 245 (Fla. 3d DCA 1993).[18] There is no dispute here that both parties performed under the Purchase Agreement and Amendment through the end of the Commitment Period.

Not once, but twice – by virtue of executing the Purchase Agreement on January 6, 2010 and then by executing the Amendment on August 23, 2010 – the parties reflected their intention and agreement to grant UCR a right of first refusal following the expiration of the Commitment Period. The right of first refusal, which was first established in the Purchase Agreement, was "incorporated" and "made part of" the Amendment, and "remain[s] in full force and effect" because it was not "expressly and specifically modified by the terms of" the Amendment. In short, Wells Fargo plainly breached the terms of the parties' agreements regarding UCR's right of first refusal, and UCR has demonstrated a clear contractual right warranting the imposition of a temporary injunction.

**B.    UCR will suffer irreparable harm for which there is no adequate remedy at law if a temporary injunction is not issued.**

In the absence of a temporary injunction, UCR will suffer irreparable harm for which there is no adequate remedy at law.

This element is met where a plaintiff establishes that it would have difficulty calculating its damages after the fact.[19] For example, in *U.S. 1 Office Corp. v. Falls Home Furnishings, Inc.*, 655 So. 2d 209 (Fla. 3d DCA 1995), the court properly entered temporary injunctive relief where

---

[18] Although UCR does not concede that the contractual choice of law provision mandates the application of Iowa law in this case, the point is immaterial because Florida law and Iowa law are identical on this score. *Compare Mehler v. Huston*, 57 So. 2d 836, 837 (Fla. 1952) *with Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010).

[19] *See Liza Danielle, Inc. v. Jamko, Inc.*, 408 So. 2d 735, 738 (Fla. Dist. Ct. App. 1982); *U.S. 1 Office Corp. v. Falls Home Furnishings, Inc.*, 655 So. 2d 209, 210 (Fla. Dist. Ct. App. 1995).

6

"it would be difficult to find a basis from which to calculate" the plaintiff's damages, particularly where the "harm was ongoing." *Id.* at 210. Similarly, in *Atomic Tattoos, LLC v. Morgan*, 45 So. 3d 63 (Fla. 2d DCA 2010), the appellate court reversed the trial court's denial of injunctive relief where "[m]onetary damages," including "the number of 'sales' lost, as well as any potential profit, would be nearly impossible to calculate, particularly with a continuing breach." *Id.* at 66. And in *Zimmerman v. D.C.A. at Welleby, Inc.*, 505 So. 2d 1371 (Fla. 4th DCA 1987), the court explained that the harm to plaintiff is irreparable and money damages are inadequate where the harm is "said to be speculative and unascertainable" "because of the difficulty in determining how many sales were lost and what the profit on each sale would have been." *Id.* at 1373.

Likewise here, the April Receivables are comprised of thousands of unique, individual accounts on which UCR would attempt to collect if its right to purchase them is enforced. It will be extremely difficult, if not impossible, to determine the basis of UCR's damages in the form of lost profits, as profits are contingent upon the circumstances of each account holder and the debt collection process. If the April Receivables are sold to a third party, it will be nearly impossible to calculate the profits that UCR's unique skills and resources would have allowed it to earn had Wells Fargo honored its right of first refusal. Moreover, in the absence of injunctive relief, the complexity of these proceedings will increase exponentially, as it will be necessary to investigate the third-party purchaser's collection processes and techniques, and likely require the joinder of additional parties.

Because of this difficulty in calculating its damages, UCR is entitled to a temporary injunction to prohibit the sale of the April Receivables to a third-party buyer pending an evidentiary hearing on UCR's request for preliminary injunction.

7

C.   **The public interest will be served be served by the issuance of the injunction.**

The public interest will be served by the issuance of the injunction.  Under Florida law, "the public has a cognizable interest in the protection and enforcement of contractual rights." *Hilb Rogal & Hobbs of Fla., Inc. v. Grimmel*, 48 So. 3d 957, 962 (Fla. 4th DCA 2010). Generally speaking, Florida courts will only interfere with the freedom of contract when the particular agreement undermines some serious social concern, which is clearly not present in this run-of-the mill breach of contract action.[20]

Here, Wells Fargo and UCR, both sophisticated business entities, entered into the Purchase Agreement at arms-length with the expectation that the terms of their agreement would be enforced.  Moreover, a temporary injunction is necessary to ensure that UCR's bargained-for right of first refusal is enforced.  In addition, the right of first refusal does not violate any public policy of the State of Florida; in fact, the temporary injunction will have no concrete effect on the public whatsoever.

In addition, although UCR now faces significant hardship and business losses as a result of Wells Fargo's breach, Wells Fargo will not be prejudiced if it is forced to honor UCR's right of first refusal.  UCR's right of first refusal simply provides it with the right to purchase the Receivables on the same terms as the highest bidder.  That is, Wells Fargo will receive the same purchase price regardless of whether it sells to UCR or a third-party.  As such, the public interest will not be disserved by the issuance of the temporary injunction.

---

[20] *Compare Ranger Ins. Co. v. Bal Harbour Club, Inc.*, 549 So. 2d 1005 (Fla. 1989) (refusing to enforce insurance provision indemnifying landlord for acts of religious discrimination); *Hoffman v. Boyd*, 698 So. 2d 346, 347 (Fla. 4th DCA 1997) (refusing to enforce provision in which man agreed to financially provide for woman if he did not marry her within a specified period); *McNamara v. McNamara*, 988 So. 2d 1255, 1256 (Fla. 5th DCA 2008) (refusing to enforce provision in antenuptial agreement waiving wife's right to pre-judgment attorney's fees).

8

**IV.**   **CONCLUSION**

UCR has established its entitlement to a temporary injunction.  Wells Fargo has violated UCR's clear legal right of first refusal with respect to the April Receivables.   Moreover, UCR will suffer irreparable harm for which there is no adequate remedy at law without the issuance of the temporary injunction because calculating UCR's damages following litigation will be an onerous, expensive, and complex process.  Finally, the temporary injunction will not disserve the public interest—but will actually serve it—by furthering freedom of contract and the public's expectation that valid contracts will be enforced.  Therefore, the Court should grant UCR's motion for a temporary injunction.

Dated: April 16, 2012

Respectfully Submitted,

By: _____
Larry A. Stumpf, Esq.
Florida Bar No. 280526
Joshua Shore, Esq.
Florida Bar No. 031894
Black, Srebnick, Kornspan & Stumpf, P.A.
201 S. Biscayne Boulevard Suite 1300
Miami, Florida 33131
Tel: (305) 371-6421
Fax: (305) 371-6322

*Counsel for Plaintiff*

9

Exhibit A

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

UNITED CREDIT RECOVERY, LLC

Plaintiff,

v.

WELLS FARGO BANK, N.A.

Defendant.

CASE NO. 12-15002 CA 08

FILED
APR 16 2012

_____

### AFFIDAVIT OF LEN POTILLO

I, the undersigned, being first duly sworn, do hereby state under oath and penalty of perjury that the following facts are true:

1. I am over the age of 18 and am a resident of the State of Florida. I have personal knowledge of the facts herein and, if called as a witness, could testify competently thereto.

2. I am sole member of United Credit Recovery, LLC ("UCR"). UCR is a financial institution engaged in, among other things, the business of purchasing demand deposit checking accounts with overdraft balances from other financial institutions, on which accounts it then attempts to collect.

3. On January 6, 2010, UCR and Wells Fargo entered into a Purchase Agreement pursuant to which UCR agreed to purchase Wells Fargo's demand deposit checking accounts with overdraft balances (the "Receivables"). I negotiated and executed the Purchase Agreement on behalf of UCR. Under the terms of the Purchase Agreement, Wells Fargo agreed to sell to UCR on a monthly basis its eligible Receivables for a specified percentage of the aggregate outstanding balance of those Receivables. UCR and Wells Fargo agreed to a "Commitment

Period" in the Purchase Agreement, during which time Wells Fargo would sell its Receivables to UCR at the agreed-upon price.  Originally, it was agreed that the Commitment Period would be from February 1, 2010 to June 30, 2011.  In the Purchase Agreement, UCR and Wells Fargo also agreed that, at the end of the Commitment Period, UCR would have a continuing right of first refusal to purchase any additional Receivables that Wells Fargo decided to sell.

4.      On August 23, 2010, Wells Fargo and UCR executed an Amendment to the Purchase Agreement (the "Amendment"), which I negotiated and signed on behalf of UCR.  The express purposes of the Amendment were to extend the Commitment Period through January 31, 2012 and to modify the purchase price.  The parties did not discuss modifying or eliminating UCR's right of first refusal through the Amendment, and it was not the parties' intention to modify or eliminate that right.  Rather, as plainly stated in the Amendment, that document incorporated all of the Purchase Agreement's terms and conditions unless expressly and specifically modified by the Amendment.  Both Wells Fargo and UCR performed under the Purchase Agreement and the Amendment through the end of the Commitment Period of January 31, 2012.

5.      The right of first refusal was integral to UCR signing both the Purchase Agreement and the Amendment. UCR would not have entered into the Purchase Agreement or Amendment with Wells Fargo on the same terms that it did, but for the inclusion of UCR's right of first refusal that would extend beyond the Commitment Period.

6.      After the Commitment Period ended, I learned that Wells Fargo had offered new Receivables for sale without first contacting UCR.

7.      UCR immediately contacted Wells Fargo to exercise its right of first refusal to purchase the Receivables at the same price as the highest bid received by Wells Fargo.  When

2

Wells Fargo's sales group refused to honor UCR's right of first refusal, I personally contacted Wells Fargo and, again, expressed UCR's decision to exercise its right to purchase the Receivables. *See* Ex. A, March 15, 2012 email to John Stumpf of Wells Fargo.

8.  Wells Fargo responded, taking the position that the Amendment somehow extinguished UCR's right of first refusal, despite that the Amendment incorporated the Purchase Agreement's terms and conditions and did not expressly and specifically modify UCR's right of first refusal, and it was not the parties' intention to eliminate that contractual right through the Amendment. *See* Ex. B, March 16, 2012 email from Marcus O'Sullivan.

9.  Despite UCR's multiple demands that Wells Fargo honor the parties' agreement and sell the Receivables to UCR, Wells Fargo has refused, and has continued to negotiate with other bidders, necessitating this lawsuit.

10.  Wells Fargo's refusal to recognize UCR's right to purchase the Receivables has severely disrupted UCR's business.  The Receivables UCR purchased from Wells Fargo over the last two years represented a significant portion of UCR's collection business, comprising up to one-third of UCR's total accounts.  As a result of Wells Fargo's refusal to honor the parties' agreement, UCR has already had to expend significant time and resources locating reputable financial institutions offering similar products on similar terms, in addition to facing the potential loss of substantial profits.

11.  If UCR's right of first refusal is not enforced, UCR may never be adequately compensated for its lost profits.  The Receivables are comprised of thousands of unique, individual accounts, and the profit UCR makes on any individual account depends on the unique circumstances of each account holder.  UCR's profit also largely depends upon its institutional knowledge and expertise in the industry, as well as the time and resources it utilizes in collecting

3

any given debt. Because each debt collection company's institutional knowledge, processes and resources are different, it will be extremely difficult to calculate how much profit UCR will lose if Wells Fargo does not honor UCR's right of first refusal and, instead, sells the Receivables to another buyer.

Executed this 13th day of April, 2012, in Seminole County, Florida.

Len Potillo

STATE OF FLORIDA          )
                          )
COUNTY OF SEMINOLE        )

Sworn to and subscribed before me, this 13th day of April, 2012, by Len Potillo, who is personally known to me or who produced  drivers liscense as identification.

TAMARIN RENE DISRUD
MY COMMISSION # DD 977081
EXPIRES: July 31, 2014
Bonded Thru Notary Public Underwriters

Notary Public
My commission expires July 31 2014

4

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

UNITED CREDIT RECOVERY, LLC,
d/b/a UNITED CREDIT RECOVERY OF
SANFORD FLORIDA

               Plaintiff,

v.

                                         CASE NO. 12-150002-CA-08

WELLS FARGO BANK, N.A.

               Defendant.

_____

## NOTICE OF FILING PURCHASE AGREEMENT AND
## AMENDMENT TO PURCHASE AGREEMENT

       Pursuant to the parties' agreement, Plaintiff hereby gives notice of filing the attached

Purchase Agreement (Exhibit A) and Amendment to Purchase Agreement (Exhibit B).

Dated: April 30, 2012

                                  Respectfully Submitted,

By: _____
                    Larry A. Stumpf, Esq.
                    Florida Bar No. 280526
                    Joshua Shore, Esq.
                    Florida Bar No. 031894
                    Black, Srebnick, Kornspan & Stumpf, P.A.
                    201 S. Biscayne Boulevard Suite 1300
                    Miami, Florida 33131
                    Tel: (305) 371-6421
                    Fax: (305) 371-6322

                    *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that this *Notice of Filing* was served by U.S. mail and E-mail this **30th** day of April, 2012, to all persons listed below:

**Jay Thornton, Esq.**
Gray Robinson, P.A.
401 East Las Olas Boulevard
Suite 1850
Fort Lauderdale, Florida 33301
Jay.Thornton@gray-robinson.com

By: _____
　　　　　Joshua A. Shore, Esq.

Black, Srebnick, Kornspan & Stumpf
201 S. Biscayne Boulevard • Suite 1300 • Miami, Florida 33131 • Phone: 305-371-6421 • Fax: 305-371-6322 • www.RoyBlack.com

Exhibit A

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (the "Agreement") is made as of January 6, 2010 by and among United Credit Recovery of Sanford, Florida ("Buyer") and Wells Fargo Bank, N.A. ("Seller"). Buyer and Seller may each be individually referred to herein as a "Party" and shall be collectively referred to as the "Parties"

1.  Recitals:

   (a)   Buyer is a financial institution engaged, among other things, in the business of purchasing demand deposit checking accounts with overdraft balances;

   (b)   Seller has originated such demand deposit accounts with overdraft balances;

   (c)   Buyer wishes to purchase, and Seller wishes to sell, such demand deposit accounts;

   (d)   In consideration of the premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

2.  Definitions: Except as otherwise expressly provided herein or unless the context otherwise requires, the following terms shall have the respective meanings specified for all purposes in this Agreement:

   (a)   "Accepted Servicing Practices" means those servicing practices of prudent lending institutions which service accounts of the type represented by the Receivables, which practices shall be in accordance with all Laws;

   (b)   "Affected Receivable" means a Receivable as to which Seller has breached its representations or warranties contained in Section 5 (d) of this Agreement, or which constitutes an Ineligible Receivable;

   (c)   "Affected Receivable Notice" means a notice given by Buyer demanding Seller repurchase the subject Affected Receivable, which shall take the form and contain the information described and set forth in Section 6 of this Agreement;

   (d)   "Affiliate" means any corporation, partnership, joint venture, stock company, limited liability company, trust, association or other entity the existence of which is recognized by any governmental authority (an "Entity") that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with a Party or any Entity in which a Party has any direct or indirect ownership interest. For the purposes of this definition, the term "controls", "is controlled by" and "under common control with" means the possession, direct or indirect, of the power to cause the direction of the

1

management and policies of such Entity, whether through the ownership of voting securities, by contract, or otherwise;

(e) "Aggregate Receivables" means the total number of Receivables made subject to this Agreement;

(f) "Agreement" means this Purchase Agreement. When used herein, unless otherwise indicated, all references to this Agreement shall also be deemed to be references to the SFPA;

(g) "Obligor" means all persons or entities liable, responsible, obligated, or otherwise indicated as a borrower under the terms of the deposit account or other documents executed in conjunction or as a result of the creation of the demand deposit account constituting the subject Receivable;

(h) "Business Day" any day other than a Saturday or Sunday or a day on which banking institutions in the states where the Parties are located are authorized or obligated by law or executive order to be closed;

(i) "Closing Date" means a date or series of dates occurring during the Commitment Period and agreed to by the Parties on which Receivables are sold and the applicable Purchase Price is paid;

(j) "Commitment Period" means the period of time beginning on February 1, 2010 and ending on June 30, 2011 including a first right of refusal on additional offerings of same product herein at conclusion of this agreement.

(k) "Cut-Off Date" means the date so designated and set forth in the applicable SFPA or any other date on which the Parties determine the outstanding balance of the Receivables to be sold pursuant to the applicable SFPA;

(l) "Eligible Receivable" means any Receivable that is not an Ineligible Receivable;

(m) "Event of Default" means (i) any representation or warranty made by any Party in this Agreement being false, incorrect, or misleading in any Material respect on the date made, (ii) failure on the part of any Party to observe or perform any of the covenants or agreements on the part of such Party set forth in this Agreement, (iii) the loss by any Party of any license or authorization required in order to perform its duties or obligation under the terms of this Agreement, (iv) the entry against a Party or any Affiliate of a decree or order of a court, agency, or supervisory authority having jurisdiction for the appointment of a trustee, conservator, receiver, or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of such Party's or any Affiliate's affairs, and such decree or order remaining in force and undischarged for a period of sixty (60) days;

2

(n)   "Execution Date" means the date of this Agreement;

(o)   "Ineligible Receivables" means any Receivable as to which, on or before the Closing Date (i) a final judgment has been entered by a court of competent jurisdiction in favor of Seller pursuant to legal proceedings or litigation commenced before the applicable Closing Date, (ii) which has been filed in bankruptcy any time before or within sixty (60) days after the applicable Closing Date and which has not been dismissed, (iii) in which all Obligors were deceased, or (iv) which was fraudulently originated or which otherwise qualifies on or before the applicable Closing Date as a fraudulent Receivable such that a purported Obligor has no liability for such Receivable, (v) is deemed ineligible for legal process or litigation due to expiration of the statute of limitations thereby becoming an out-of-statute Receivable;

(p)   "Initially Requested Receivables Documents" means Receivables Documents requested by Buyer for a number of Receivables equal to one percent (1.0%) of the Aggregate Receivables;

(q)   "Law(s)" means (i) all applicable statutes, rules, regulations, and ordinances of any federal, state, local and other governmental or regulatory authority, including, but not limited to, Truth-In-Lending Act, Equal Credit Opportunity Act, Home Mortgage Disclosure Act, Real Estate Settlement Procedures Act, Fair Debt Collection Practices Act, Fair Credit Reporting Act, Graham-Leach-Bliley Act, Fair And Accurate Credit Transaction Act, and all other applicable consumer protection, collection and privacy statutes and regulations, (ii) all applicable requirements and guidelines of any governmental or government-sponsored entity, board, commission, agency, instrumentality or other governmental body or officer having jurisdiction, and (iii) all applicable judicial and administrative judgments, consent decrees, orders, stipulations, award, settlement agreements, writs, and injunctions;

(r)   "Losses" means one or more of any third party, non-Obligor, claims, damages, liabilities, costs, charges, expenses, penalties, payments, fines, forfeitures, actions, causes of action, and judgments, of any kind or nature whatsoever, actually incurred by a Party , including, without limitation, attorney fees and costs, costs of investigation, disbursements, and other out-of-pocket expenses;

(s)   "Master File(s)" means, for each Receivable, a data file or data files containing the information reflected on Exhibit B attached hereto;

(t)   "Material" or "Materially" means a condition, situation, or circumstance, or the occurrence of a condition, situation, or circumstance, which would be reasonably likely to have or to cause a Material Adverse Affect;

(u)   "Material Adverse Affect" means an affect upon the business, operations, properties, assets, condition (financial or otherwise) or prospects of a Party which

significantly impair its ability to perform its obligations under this Agreement or the ability of another Party to enforce such obligations or which significantly and adversely affect the collectability of a Receivable;

(v)     "Purchase Price" means a sum equal to the product of the Purchase Price Percentage and the aggregate outstanding balance of the Receivables on the applicable Cut-Off Date;

(w)     "Purchase Price Percentage" means 2.67%;

(x)     "Receivables" means those demand deposit accounts with overdraft balances, which do not constitute Ineligible Receivables, which have been charged off Seller's books prior to the applicable Cut-Off Date, and which are made the subject of purchase and sale under the terms of this Agreement;

(y)     "Receivables Document(s)" means all information contained in Exhibit B as well as any application, agreement, billing statement, notice, correspondence, or other documentation or information in Seller's possession related to a Receivable;

(z)     "Re-Purchase Price" means the Purchase Price for each affected Receivable less any payments or amounts received or recovered by or on behalf of Buyer.

(aa)    "Retrieval Period" means the time period of 365 days beginning on and including the Execution Date;

(bb)    "Service" or "Servicing" or "Serviced" regardless whether being performed by a Party referred to as a "servicer" or as a "sub-servicer" means, by way of inclusion and not limitation, the rights, duties, and obligations under the Agreement or otherwise, to administer, collect the payments of the reduction of principal and application of interest, remit collected payments, engage in enforcement and collection activities regarding the Receivables, make advances, and perform all other obligations and duties required under or by reason of this Agreement, or any other agreement to which a Party performing such functions and activities may be bound, or by the general and accepted industry standards or requirements relating to the Receivables an/or any collection and/or enforcement activities relating thereto;

(cc)    "SFPA" mean a short form purchase agreement, along with the schedules and attachments, in the form of Exhibit A attached hereto;

3.     <u>Sale of Receivables</u>.   Upon the terms and subject to the conditions hereof, and of the applicable SFPA, Seller will, on a monthly basis during the Commitment Period, sell and assign to Buyer, and Buyer will purchase from Seller, certain Receivables contained in the electronic file to the applicable SFPA, said file to be prepared as of the applicable Cut-Off Date. Seller shall execute and deliver a SFPA to Buyer in connection with each sale and assignment of Receivables. Buyer shall assume all obligations, liabilities, duties and responsibilities of Seller to

be performed by Buyer with regard to each such Receivable and the attendant Receivable Documents.

4.   Closing Date.   On each applicable Closing Date, Buyer shall tender the applicable Purchase Price to Seller and Seller shall sell and assign to Buyer the Receivables received in the electronic file to the applicable SFPA. The applicable Purchase Price payment, or the applicable Alternative Purchase Price payment, depending on whether or not the affected Receivables are Supplemental Receivables, shall be made by wire transfer of immediately available funds to an account or accounts previously designated by Seller and shall be received no later than 5:00 PM Eastern Time on the applicable Closing Date. The Master Files shall be delivered two days prior to the Closing Date.

5.   Seller Warranties.   Seller represents and warrants as of the Execution Date and each applicable Closing Date, that:

(a)   It is an entity duly formed and validly existing under the laws of the United States of America with full power, authority, and legal right to sell the Receivables, to enter into this Agreement, to perform all of its obligations under this Agreement, and to carry out the transactions contemplated herein and therein.  All necessary corporate action on the part of Seller has been or shall be duly taken to authorize the sale of the Receivables and to accomplish the due execution of this Agreement by a duly authorized officer or representative.

(b)   Seller has the power and authority and all licenses and permits, if any, required by any governmental body or regulatory authority to carry on its business as now being conducted which relates to the Receivables. Apart from such as have already been obtained, no further authorization, consent, approval, license, qualification, or formal exemption from, nor any filing, declaration or registration with, any governmental agency or regulatory authority or any other body is required in connection with the execution, delivery, or performance by Seller of this Agreement and the sale of the Receivables;

(c)   To the best of Seller's knowledge, the Receivables have, in all Material respects, been originated, underwritten and Serviced in Material compliance with all Laws.

(d)   Seller has good and marketable title to all of the Receivables, free and clear of all claims, liens, pledges and other encumbrances of any kind whatsoever.

(e)   Seller will sell and transfer the Receivables to Buyer without recourse, and without any express or implied representation or warranty, except as provided in this Agreement. Seller has made no representation, and now makes no representation, with respect to any of the Receivables or with respect to the completeness and accuracy of any Receivables Documents. To the best of Seller's knowledge, Seller has performed all of its obligations regarding the Receivables and there is no requirement for future advances or performance on the part of Seller

5

(f)     The sale of the Receivables hereunder (i) is not made in contemplation of the insolvency of Seller, (ii) is not made with the intent to hinder, delay or defraud Seller or its creditors, (iii) will be recorded in the records of Seller in accordance with its policy and applicable Law, and (iv) represents a bona fide and arm's length transaction undertaken for adequate consideration and in the ordinary course of business. Seller acknowledges and represents that Buyer is neither an insider nor an Affiliate of Seller;

(g)     All Receivables sold or to be sold by Seller pursuant to this Agreement, together with any instruments securing the same, were made for valuable consideration and now constitute valid and legally enforceable obligations of the respective persons shown as indebted thereon, as set forth therein, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, or similar laws affecting the rights of creditors generally, statutes of limitation, and by general equitable principals (regardless whether such enforcement is considered a proceeding at law or in equity).

Should any representation or warranty of Seller in Section 5 (d) with respect to any Receivable be breached in any Material respect or should a Receivable be determined to be an Ineligible Receivable, and should Buyer deliver an Affected Receivable Notice to Seller within one hundred fifty (150) days from and including the applicable Closing Date, Seller shall repurchase the Affected Receivable for the Re-Purchase Price within thirty (30) days of receipt of the Affected Receivable Notice; Provided, however, such breach must have caused a decrease in value of at least ten percent (10%) from the amount of indebtedness reflected on Schedule A relating to such Receivable; Provided, further, should the Re-Purchase Price be less than zero, such Receivable shall be re-assigned to, and remain the property of Buyer, and neither Party shall have any obligation to pay any amounts to the other Party or to any other party with regard to such Receivable. Seller shall have no obligation to re-purchase an Affected Receivable more than one hundred fifty (150) days from and including the applicable Closing Date or until the resolution of any contest or objection made in good faith by Seller as to its obligation or duty to repurchase any given Receivable. In connection with the re-purchase by Seller of any Affected Receivable, Buyer shall provide the appropriate SFPA. Except for the indemnification provisions set for the elsewhere in this Agreement, the remedies provided for in this Section shall be Buyer's sole remedies with respect to a breach by Seller of the representations or warranties set forth in Section 5 (d).

6.      Required Form of Affected Receivable Notice.  The Affected Receivable Notice shall (i) contain the related Obligor(s) name and the Seller account number related to such Affected Receivable, (ii) provide a written description of the basis for the demand for repurchase, (iii) specify the amounts, if any, collected or recovered by or on behalf of Buyer with regard to the Affected Receivable, and (iv) if relevant, enclose any or all of the following documentary evidence: **Bankruptcies;** One or more of the following (A) credit bureau listing of non-dismissed bankruptcies, (B) name of Obligor's attorney, case number(s) and date(s) of filing, (C) court certified copies of court pleadings, (D) BANKO, PACER or Accurint listing or report of non-dismissed bankruptcies, or (E) any other third party documentation establishing the

6

Obligor's bankruptcy status as of the Cut-Off Date; **Deceased;** One or more of the following: (A) certified copy of death certificate(s), (B) copy of nationally recognized credit bureau indicating date(s) of death, (C) affidavit of executor of Obligor's estate(s) verifying date(s) of death, or (D) any other third party documentation establishing the Obligor's death, including information received from Lexis Nexus, Accurint, or the Social Security Death Index; **Fraud;** One or more of the following (A) a sworn and notarized affidavit from the Obligor(s), (B) a copy of the police report related to such allegation of fraud, (C) a copy of an identity theft complaint with a nationally recognized credit bureau with respect to such Affected Receivable, or (D) any third party documentation establishing the fraud claim of the Obligor(s); **Out Of Statute;** (A) a statement of statutory time permissions for legal process debt collection in state of Obligor's principal place of residence.

7.     Seller's Right of Repurchase.  Upon ten (10) days prior notice and for a period of ninety (90) days from the applicable Closing Date, for reasons which are not related to the settlement of any Receivable, Seller shall have the right to repurchase for the Re- Purchase Price any Receivable that has not been paid in full, released, or settled by Buyer, if Seller determines that there is a pending or threatened suit, arbitration, bankruptcy proceeding or other legal proceeding, or a threatened, pending or existing investigation relating to fraud or negligence, relating to a Receivable or the Obligor(s) thereon, naming Seller or otherwise involving Seller's interest therein in a manner unacceptable to Seller, or should Seller otherwise determine (in its sole discretion) that issues relating to such Receivable cannot be resolved and/or that Seller's interest therein cannot be adequately protected without Seller owning such Receivable. Seller shall notify Buyer, in writing, of the identity of such Receivable(s). Seller shall also have the right to repurchase (in its sole discretion) any Receivable should it determine there has been a Material failure on the part of Buyer to adhere to the requirements of Sections 8 or 9 of this Agreement or that any of Buyer's representations and warranties contained in Sections 8 or 9 or elsewhere in this Agreement are false or inaccurate. In the event of a repurchase pursuant to the terms of this Section, Buyer shall assign the subject Receivable to Seller and shall execute an appropriate SFPA and such other documentation as may be necessary to properly complete the re-assignment of the subject Receivable.

8.     Corporate Representations and Warranties of Buyer.  Buyer represents and warrants as of the Execution Date and of each Closing Date, that:

(a)     It is a duly incorporated and validly existing corporation with full power, authority and legal right to enter into this Agreement, to perform all of its obligations hereunder, and to carry out the transactions contemplated hereby; Buyer has full power, authority, and legal right to perform all of its obligations hereunder, and to acquire and hold the Receivables, to enter into this Agreement, and the SFPA, and to perform all of its obligations hereunder and thereunder, and to carry out the transactions contemplated hereby and thereby;

(b)     It is duly qualified or otherwise authorized to do business as a limited liability company in good standing under the laws of each state, or other such jurisdiction in which either the ownership or servicing of the Receivables requires such

7

qualification. It has all necessary licenses and permits, all of which are in full force and effect, required by any governmental authority to carry on its business as now being conducted and to own and service the Receivables;

(c)     All necessary action has been or shall be duly taken to authorize the execution of this Agreement by a duly authorized officer and to authorize the purchase of the Receivables;

(d)     It has made such independent investigation as it deems to be warranted into the nature, validity, enforceability, and value of the Receivables, and all other facts it deems Material to the purchase, and is entering into the transaction herein contemplated solely on the basis of that investigation and its own judgment, and is not acting in reliance on any representation (either written or oral) or other information furnished by Seller, or anyone purporting to represent Seller other than as set forth herein. Buyer is purchasing the Receivables with the knowledge that they may be uncollectible and without value and may be subject to rights of Obligors;

9.     Operational Representations, Warranties and Covenants of Buyer.  Buyer, for itself and its officers, agents, employees and representatives, hereby represents, warrants, covenants, and/or acknowledges and agrees, as appropriate and as the context requires, with regard to each purchased Receivable that:

(a)     It shall comply with all Accepted Servicing Practices and with all applicable Laws in connection with its ownership and the Servicing of the Receivables;

(b)     Neither Buyer, nor anyone acting on its behalf, has any authority to act for or in the name of Seller or any of its Affiliates with respect to collection of any Receivables or with respect to any other matter. Buyer will not use, or refer to, the name of Seller or any of its Affiliates for any purpose relating to any Receivable, except that Seller's name may be used for the purpose of identifying a Receivable in connection with its collection or in identifying the chain of title to a purchaser of, or in connection with a securitization transaction involving, the Receivable. Buyer will not portray itself as an agent, partner or joint venture associate of Seller, or of any of Seller's Affiliates, of or any of its agents with respect to any Receivable. Buyer will not expressly or impliedly represent at any time that it, or anyone acting on its behalf, is employed by or represents Seller or any of Seller's Affiliates as an independent or other agent or that it has any authority to act for or on behalf of Seller or any of Seller's Affiliates;

(c)     Buyer will not allege with respect to a Receivable any legal rights that do not exist (including representing that a lawsuit will be filed with regard to a Receivable for which the applicable statute of limitations has run);

(d)     Buyer will not take any enforcement action against any Obligor, or other person or entity, in connection with a Receivable that would be commercially

8

unreasonable, or that would misrepresent or otherwise fail to adequately disclose to any particular Borrower or other person or entity the identity of the Buyer, or any other party, as the owner of the Receivable;

(e)     After each applicable Closing Date, Buyer will handle any inquiries about the Receivables directly and will not refer to Seller any Obligor or other person or entity with an inquiry about a Receivable;

(f)     The sale and transfer of each Receivable as provided for in this Agreement and in the applicable SFPA is expressly made solely with the recourse and representations or warranties set forth herein and without any other recourse, representation or warranty, express or implied, or any kind or character whatsoever;

(g)     Buyer is a sophisticated investor and has sufficient knowledge and experience in business matters to enable it to evaluate the merits and risks of the transaction contemplated hereunder. It has made such independent investigation as it deems to be warranted into the nature, title, validity, enforceability, and value of the Receivables, and all other facts it deems Material to the purchase of the Receivables and is entering into the transaction herein provided for solely on the basis of that investigation and its own judgment and is not acting in reliance on any representations or warranty of information furnished by Seller except as otherwise provided for herein;

(h)     All, or a substantial number, of the Receivables may be non-performing and may be subject to actual or potential claims by Obligors or other persons or entities. Not withstanding, Buyer purchases the Receivables subject to any rights, pending or potential, of Obligors or other persons or entities. Further, each Purchase Price properly and accurately reflects the quality of the assets (including any faults, liabilities, defects or other adverse matters that may be associated with the Receivables or the underlying documents) and the "as is" nature of the sale. Buyer has been fully informed as to the nature of these Receivables and has agreed to the purchase of them as contemplated by this Agreement.

(i)     Should Buyer, or any of its successors or assigns, or anyone acting on its behalf, file or otherwise become engaged in a legal or administrative action or proceeding regarding a Receivable and request or subpoena Seller, or any of its officers, agents, employees or representatives to appear at a trial, hearing, arbitration, deposition, or any other nature or manner of legal or administrative proceeding to testify with regard to, or to discuss or converse about or regarding, a Receivable, Buyer shall compensate Seller at a daily rate of $200 while Seller, or any of its officers, agents, employees, or representatives are traveling to, attending and testifying, discussing or conversing as provided for herein, whether or not Seller, or any of its officers, agents, employees or representatives is called as a witness. Seller shall also be reimbursed from the same source as making the other

9

payments under this Subsection, for reasonable out-of-pocket travel and related expenses.

10.   Notice of Claims.  Buyer will immediately notify Seller of any claim or threatened claim against Seller, or any claim or threatened claim that may affect Seller, discovered by Buyer or of which Buyer becomes aware, through whatever source and for whatever reason.

11.   Consumer Reporting Agencies/Customer Contact.  To the extent possible, Seller will notify a consumer reporting agency (i.e. ChexSystems and EWS Systems) of the transfer of accounts as sold per transaction as referenced by each SFPA. To the extent possible, Buyer will notify a consumer reporting agency (i.e. ChexSystems and EWS Systems) with updates to the status of accounts purchased per transaction as referenced by each SFPA.

(a)   Buyer will not report any of the Accounts to any credit-reporting agency nor will any subsequent purchaser be allowed to report the accounts to a credit reporting agency.

12   Reg AB.  None of the Receivables will, at any time, be subject to the provisions of United States Securities Regulation AB or any similar Law. At no time shall Seller be responsible to Buyer, or to any other party whatsoever, to provide the materials or information required by Regulation AB or by any similar Law or, except as may be expressly stated herein, to provide Buyer, or any other third party whatsoever and information, material, or documentation of any kind, type, or nature..

13   Assumption of Debt.  Buyer does not assume or incur, and shall not in any manner become liable for, any debt, obligation, or liability of Seller, except as specifically provided herein.

14   Notices.  Seller consents (insofar as it may lawfully do so) to permit Buyer, and Buyer hereby agrees, to advise the Borrower on and after each applicable Closing Date that Buyer has purchased his, her or their Receivable and that all future payments thereon shall be made to Buyer. The Parties will mutually agree on acceptable language to be used in any such mailings. The mailings will be consistent with all applicable Laws.

15   Post Cut-Off Date Payments.  Payments, proceeds, or refunds on or relating to the Receivables, including without limitation, payment, proceeds, or refunds in connection with any insurance policies, received by Seller prior to the applicable Cut-Off Date shall be posted prior to such applicable Cut-Off Date. Further, an amount equal to the total of any such payments, proceeds, or refunds received by Seller in the period of time between the applicable Cut-Off Date and the related Closing Date shall be delivered to Buyer on, or promptly following, such Closing Date; otherwise Buyer may, at Buyer's option, deduct the amount of any such payments from the Purchase Price or Alternate Purchase Price. Payments, proceeds, or refunds received by Seller after the applicable Closing Date shall be delivered to Buyer within five (5) Business Days of receipt.

10

16    <u>Attorney-In-Fact.</u>  Seller hereby constitutes and appoints Buyer its true and lawful attorney-in-fact with full power of revocation and substitution in the name and stead of Seller, but on behalf of and for the benefit of Buyer, to do any and all of the following:

    (a)    To endorse Seller's name upon all checks, drafts, notes, powers and other forms of exchange received in payment on any of the Receivables purchased pursuant to this Agreement; and

    (b)    To demand, collect, and receive any and all of the Receivables, to enforce any of the rights in respect thereof (except the right to initiate or prosecute a suit in Seller's name), to give receipts and releases for and in respect of the same, and to do all acts necessary to perfect in Buyer's name any liens or security interests in real or personal property held as security for the Receivables by such Seller.

17    <u>Public Statements.</u>  Except as may be required by Law, no Party shall make any public statements with respect to this Agreement or the transactions contemplated herein, or make any such statement to an unaffiliated third party, other than to auditors, legal counsel, financing providers, regulatory authorities, rating agencies or potential purchasers, without the consent of the other Parties; <u>provided, however,</u> that nothing contained herein shall prohibit any Party from communicating directly with its employees or the employees of any of its Affiliates about this Agreement or the transactions contemplated herein or from making an announcement or disclosure that is required by applicable Law or in response to legal or administrative process. Further, this Agreement incorporates the terms and conditions of any confidentiality or nondisclosure agreement which may be currently in effect between the Parties and makes such agreement applicable to this Agreement.

18    <u>Indemnity; Insurance.</u>

    (a)    Buyer will defend, indemnify and hold Seller and its directors, officers, employees agents and representatives harmless from and against any Loss resulting, directly or indirectly, from either (i) the occurrence of an Event of Default on the part of Buyer or (ii) from an act or omission of Buyer, or any of its directors, officers, employees, agents or representatives with respect to any Receivable prior to the applicable Closing Date.

    (b)    Seller will defend, indemnify and hold Buyer and its directors, officers, employees, agents and representatives harmless from and against any Loss resulting, directly or indirectly, from either (i) the occurrence of an Event of Default on the part of Seller or (ii) from an act or omission of Seller or its directors, officers, employees, agents or representatives with respect to any Receivable subsequent to the applicable Closing Date.

    (c)    At all times that Buyer or any of its Affiliates or direct or indirect assignees owns or handles Receivables, Buyer (or its servicing agent) will maintain standard commercial general liability insurance with a per occurrence liability limit of not

11

less than two million Dollars (US$2,000,000.00) and an aggregate liability limit of not less than two million Dollars (US$2,000,000.00)), which also covers Buyer's indemnity obligations under this Agreement.  This requirement shall be satisfied if such insurance is maintained by a servicing agent or by a subsequent purchaser or assignee of Receivables.

(d)    This Section will survive the expiration or termination of this Agreement.

19.    Arbitration.  As between the Buyer and Seller:

(a)    This Section concerns the resolution of any controversies or claims between the Buyer and Seller, including but not limited to those arising or resulting from this Agreement (including any extensions, modifications, amendments or renewals thereof), or arising or resulting from any document, instrument or other items or material related to or delivered in connection with this Agreement, or arising or resulting from any violation or breach of the terms or conditions of this Agreement, or with regard to any claims for indemnification or damages, or relating to the re-purchase of a Receivable.

(b)    At the request of either of the Parties, any such controversy or claim will be settled by arbitration conducted in accordance with the United States Arbitration Act. The United States Arbitration Act shall apply regardless of any other choice of law provisions contained in this Agreement. A request for arbitration may only be made following a good faith attempt on the part of the Parties to resolve the dispute(s) through an exchange of correspondence and, should correspondence fail to resolve the dispute(s), to be followed within a reasonable time by a meeting between authorized representatives of the Parties, each representative having authority to settle or otherwise resolve the dispute(s).

(c)    Any arbitration proceedings will be administered by and conducted under the rules and practices of the American Arbitration Association and will be subject to its commercial rules of arbitration. All arbitration proceedings will be conducted at, or within a two hundred mile radius of, Des Moines, Iowa.

(d)    Any claim or controversy arbitrated under this Section shall be subject to any applicable statute of limitations. For the purposes of the application of statutes of limitations, the filing of an arbitration proceeding pursuant to this Section shall be the equivalent of the filing of a lawsuit and / or shall toll the statute. The arbitrators shall have the authority to decide whether any such claim or controversy is barred by statute of limitations and, if so, to dismiss the arbitration proceeding on that basis. The arbitrators shall have the authority to determine whether a claim or controversy is capable of arbitration. The decision resulting from an arbitration proceeding may be submitted to any authorized court of law to be confirmed and enforced.

(e)    This Section does not limit the right of either Party to exercise self-help remedies such as setoff, or to appear in a court of law before, during, or after the arbitration proceeding, in order to obtain either an interim remedy and / or additional or supplemental remedies.

12

(f)     The pursuit of or a successful action for interim, additional, or supplemental, remedies or the filing of a court action, does not constitute a waiver of the right of either Party, including the Party appearing in court, to submit the controversy or claim to arbitration should the other Party contest the lawsuit or action.

20     Entire Agreement.   This Agreement, and the annexes, exhibits and schedules hereto or thereto constitute the entire agreement on this subject between the Parties, and supersede all other prior agreements and understandings, both written and oral, between the Parties or their Affiliates, with respect to the subject matter hereof. Any modification, alteration, supplement or amendment to, or replacement of, this Agreement shall be in writing and executed by all Parties.

21     Receivables Documents.

(a)     During the Retrieval Period, Seller shall make best efforts to provide available requested Receivables Documents to Buyer at no cost to Buyer in an amount equal to but not to exceed the Initially Requested Receivables Documents. For all Receivable Documents requested by Buyer during the Retrieval Period in excess of the Initially Requested Receivables Documents Buyer shall pay a charge of $5.00 per request.

(b)     Buyer's request for a Receivables Document must be made with sufficient specificity to enable Seller to locate the Receivable Document in a reasonable time. Seller will use commercially reasonable efforts to provide requested Receivables Documents within thirty (30) Business Days of Buyer's request. The failure of Seller to locate a requested Receivable Document shall not be deemed a breach of this Agreement. If unable to locate a requested Receivables Document, Seller shall provide Buyer with an affidavit attesting to the name of the obligor(s), account number, amount owed, interest rate, and charge-off date of such Receivable.

(c)     Seller shall not be obligated to furnish Buyer with verbal information. Should Buyer request verbal information, and should the information be available to Seller, then in consideration of an hourly compensation rate of twenty-five dollars (US $25.00), Seller may, at its option and in its sole discretion, provide the requested information.

22.     Third Party Assignment.   Buyer may sell or assign any Receivables acquired hereunder to a third party (including an Affiliate of Buyer), provided that (a) Buyer uses its best efforts to ensure that any such subsequent purchaser or assignee is a reputable and financially sound entity that shall provide Buyer with industry typical indemnifications, and (b) Buyer requires, and every such purchaser of any right, title or interest in and to any Receivable expressly agrees in writing to assume all of Buyer's obligations under this Agreement, including, without limitation, its indemnity and insurance obligations and its obligations with respect to sales or assignments under this and other Sections of this Agreement. Buyer shall only sell or assign Receivables after making a good faith investigation of, and a determination with respect to, the potential

13

purchaser's or assignee's integrity and financial reliability. No sale or transfer of Receivables by Buyer to a third party will (i) relieve Buyer of any of its obligations under this Agreement, including, without limitation, its indemnity and insurance obligations under the terms of this Agreement, or (ii) entitle such third party to any rights against Seller hererunder, including, without limitation, any right to (w) rely or bring an action upon Seller's representations, warranties, or covenants hereunder, (x) require Seller to repurchase any Receivable, (y) indemnification under the terms of this Agreement or otherwise, or (z) request or obtain any Receivable Document from Seller.

23.     Assignment or Subrogation.  Without the express prior written consent of Seller, neither Buyer nor any other person or entity shall have any right to assign this Agreement, or the rights, privileges, duties and obligations hereunder. Further, Buyer shall have no right of subrogation with regard to this Agreement, or its rights, privileges, duties, responsibilities or remedies.

24.     Tax Information.  Seller shall comply with all tax information-reporting requirements related to the Receivables for the time prior to the applicable Closing Date, and Buyer shall comply with all tax information-reporting requirements related to the Receivables after the Closing Date. Buyer agrees to permit Seller and Seller's representatives to have access to such personnel and records of Buyer as Seller may reasonably request in order to accomplish such reporting. Buyer agrees that Seller shall retain its right to claim any potential sales tax refunds or deductions as a result of bad debt losses charged off by Seller on any and all Receivables. To the extent permitted by applicable Law, Buyer agrees that it will not claim any future deduction or refund with respect to any Receivable related to sales tax and hereby relinquishes any claim it may have to any such future deduction or refund.

25.     Brokers.  The Parties represent and warrant each to the other that neither it nor any of its respective officers or directors has employed or authorized any broker or finder to act directly or indirectly on its behalf or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees in connection with this Agreement or the transactions contemplated hereby.

26.     Notices.  Notices permitted or required hereunder shall be in writing and shall be addressed as follows:

    If to Buyer:

    United Credit Recovery LLC
    5224 ~~5524~~ West SR 46 – Suite 319
    Sanford, FL  32771
    Fax#  877-486-5340

    Attention:  Len Potillo

    If to Seller:

Wells Fargo Bank, N.A.
18700 NW Walker Road
Beaverton, OR 97006
Attention: Dann King

With a copy to:

Wells Fargo Bank, N.A.
Attn: General Counsel
MAC# F4030-010
800 Walnut Street
Des Moines, IA 50309
Fax: 515-557-7602

All such notices shall be sent via facsimile and overnight mail or courier service and shall be conclusively deemed received on the date indicated on the facsimile confirmation sheet and/or overnight mail or courier receipt, as applicable.

27.     Fees.  Whether or not any of the transactions contemplated hereby are consummated, all fees and expenses incurred in connection with this Agreement, and the transactions contemplated hereby, shall be paid by the Party incurring such expenses.

28.     Third Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended to confer upon any person or entity other than the Parties hereto or their respective successors any rights or remedies under or by reason of this Agreement.

29.     Ordinary Course of Business.  The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of Seller, who is in the business of selling accounts of a type represented by the Receivables and the Receivables are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction.

30.     Sale Treatment.  Seller has determined that the disposition of the Receivables pursuant to this Agreement will be afforded sale treatment for accounting and tax purposes.

31.     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the state of Iowa (without reference to conflicts of laws rules thereof).

32.     Future Assurances.  Each of the Parties agrees, upon the request of the other Party, to do, make, execute and deliver or cause to be done, made, executed and delivered, all such further acts, instruments, documents and things as may be reasonably required to carry out the intent and purpose of and to give full effect to this Agreement as set forth and reflected herein.

33.     Confidentiality.  This Agreement, and the consideration paid for the Receivables, and the nature and terms of this transaction, will remain confidential and will not be disclosed by either Party, without the written consent of the other, except to the extent such disclosure is (i) required

15

to be made under any applicable court order, law, or regulation, (ii) required to be made to any tax, banking, or other regulatory authority or legal or financial ad visor of either Party, (iii) made in connection with the Seller's assignment of substantially all its consumer accounts to an Affiliate, or (iv) is made in connection with the sale or other transfer of any Receivable or interest therein by the Buyer or its successors or assigns. With respect other information in their respective possession regarding customers of the other Party, each Party shall comply with their respective policies and procedures applicable to information security and privacy of information identifiable to such customers, as amended from time to time. The Parties intend to generally meet accepted industry standards, as the same may relate to information security and privacy. With respect to their electronic data storage and transmission, the Parties shall mutually resolve issues related to network or system security breaches or known threats or risks that may impact the Parties, or either of them.

34.   Waivers.  No waiver of any single breach or default will be deemed a waiver of any other breach or default of this Agreement. All rights and remedies, either under this Agreement or by law or in equity afforded to a Party shall be cumulative and not alternative.

35.   Independent Contractors.   Nothing in this Agreement shall be deemed to create partnership or joint venture between the Parties. Except as expressly set for the herein, no Party shall have any authority to bind or commit the other Party. In the performance of its duties or obligations under this Agreement or any other contract, commitment, undertaking, or agreement made pursuant to this Agreement, each Party shall not be deemed to be, or permit itself to be, understood as an agent of the other Party and shall at all times take whaever measures are necessary or appropriate to ensure that its status shall be that of an independent contractor operating a separate entity.

36.   Counterparts.  This Agreement may be executed by facsimile and in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. The exchange of copies of this Agreement and of signature pages by facsimile transmission shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signature for all purposes.

37.   Waivers.  No waiver of any single breach or default will be deemed a waiver of any other breach or default of this Agreement. All rights and remedies, either under this Agreement, or by law or otherwise, afforded to a Party shall be cumulative and not alternative.

38.   Time.  Time shall be of the essence of this Agreement.

39.   Headings. The Section headings contained in this Agreement are inserted for convenience only, and shall not affect the meaning or interpretation of this Agreement or if any provision thereof.

16

(Signature Page Follows)

**IN WITNESS WHEREOF**, the Parties have duly executed this **PURCHASE AGREEMENT** as of the date first set forth above.

Buyer:

UNITED CREDIT RECOVERY
OF SANFORD, FLORIDA

By: _____

Name: _Leonard G Portillo_

Title: _SVP_

Seller:

WELLS FARGO BANK, N.A.

By: _____

Name: _MICHAEL R JAMES_

Title: _G & VP_

**EXHIBIT A**

SHORT FORM PURCHASE AGREEMENT

This Short Form Purchase Agreement ("SFPA") is entered into this ___ day of _____, 20__ by and between United Credit Recovery of Sanford, Florida, as Buyer, and Wells Fargo Bank, N.A. as Seller.

Pursuant to the terms of a Purchase Agreement (the "Agreement") executed by the Parties and this SFPA, Buyer hereby purchases and accepts, and Seller hereby sells, assigns, transfers, and conveys to Buyer, all its rights, interest and title in and to the Receivables listed on the attached Schedule A. The Agreement is incorporated herein and made a part hereof as if fully set forth. In the event of a conflict between the terms of this Bill of Sale and those of the Agreement, the terms of the Agreement shall prevail. All terms defined in the Agreement shall have the same meaning as given in the Agreement when used in this SFPA.

Seller:  Wells Fargo Bank, N.A.

Buyer: United Credit Recovery of Sanford, Florida

Number of Receivables:_____

Outstanding Gross Balance of Receivables: $_____

List of Receivables attached hereto as Schedule A

Purchase Price: $_____

Cut-Off Date: _____

Closing Date: _____

BUYER.                                                SELLER.

UNITED CREDIT RECOVERY OF SANFORD,    WELLS FARGO BANK, N.A.
FLORIDA

                                                     By: _____
                                                     Name:
By: _____                           Title:
Name:
Title:

19

## EXHIBIT B

Master File Information

Company ID
Account Number
Charge off reason code
Last Monetary transaction date
Last Monetary transaction amount
Current Amount Due
Hard dollar amount
Soft dollar amount
Charge-Off Date
Last payment amount
Last payment date
APR
Last Payment Amount
Last Payment Date
Borrower Name(s)
Borrower SSN
Co-Borrower
Co-Borrower SSN
Address
Telephone Number
Phone Type
Phone Availability
Account open date
Third Party date assigned
Third Party amount placed
Third Party date returned
Third Party return reason
Third Party recall reason
Third Party Total payment amount
Third Party Last payment date
Third Party Last payment amount
Third Party number of payments
Original portfolio type

Exhibit B

Wells Fargo Document ID: 12116857

## AMENDMENT TO PURCHASE AGREEMENT

**This Amendment To Purchase Agreement** (the "Amendment") is entered into and shall be effective as of the 23rd day of August, 2010 by and between United Credit Recovery of Sanford Florida ("Buyer") and Wells Fargo Bank, N.A. ("Seller"). Buyer and Seller may each be individually referred to herein as a "Party" and may be collectively referred to as the "Parties".

1.     **Recitations:**

    a. Previously, on or about January 6, 2010, the Parties entered into a Purchase Agreement (the "Agreement") for the purchase by Buyer from Seller, from time to time, of certain demand deposit accounts with overdraft balances.

    b. The Parties now wish to amend the terms of the Agreement to extend the term of the Agreement and to modify the pricing terms, all as set forth therein.

    c. The Parties have entered into this Amendment for the purposes of effectuating the wish to amend the Agreement.

2.     **Amendment of Defined Terms:**   Unless otherwise indicated, or unless the context requires otherwise, all defined terms shall be given the same meaning when used in this Amendment as is given when used in the Agreement. The following defined term shall be amended as follows:

    "Commitment Period" means the period of time beginning on August 1, 2010 and ending January 31, 2012, unless sooner terminated in accordance with the terms of this Agreement.

    "Purchase Price Percentage" means 2.80%;

3.     **Incorporation:**  The Agreement, and all its terms and conditions, is incorporated herein and made a part hereof as if fully set forth. The terms of this Amendment and of the Agreement shall, whenever possible, be read each consistent with the other: however, in the event of a conflict between the terms of the Agreement and of this Amendment, the terms of this Amendment shall prevail.

4.     **Terms of Agreement:**  Unless otherwise expressly and specifically modified by the terms of this Amendment, all terms, conditions, representations, warranties, duties, responsibilities, rights, and privileges of the Agreement remain in full force and effect.

5.     **Assurances:**  The Parties agree to execute such additional documents as are reasonably deemed necessary to carry out the intent of this Amendment.

WELLS
FARGO

Wells Fargo Document ID: 12116857

6.    **Governing Language:**  No terms of the Agreement shall be modified by this Amendment unless expressly stated herein. The terms and conditions of the Agreement and of this Amendment shall be read consistently each with the other. However, to the extent there is any conflict between the Agreement and this Amendment with regard to any term or condition of the Agreement, the terms of this Amendment shall be controlling

7.    **Amendment:** Neither this Amendment nor any of its provisions may be changed, waived, or discharged orally. Any change, waiver, or discharge may be effected only by a writing signed by the Party against which endorsement of such change, waiver, or discharge is sought.

8.    **Counterparts:**  This Amendment may be signed in counterparts, each of which shall constitute part of the original document.

BY SIGNING BELOW, the Parties accept and agree to the terms and covenants contained in this Amendment.

WELLS FARGO BANK, N.A.

By: _____

Name: _____

Title:

UNITED CREDIT RECOVERY OF SANFORD, FLORIDA

By: _____

Name: _Len Potillo_

Title: _Director_